1
2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

3

UNITED STATES OF AMERICA        :

4                                :

       vs.                       :

5                                :

FERNANDO RIVAS                   :        2:11 CR 2290

6

7

8

9

     Sentencing in the above-captioned matter held on

Tuesday, September 24, 2013, commencing at 10:57 a.m.,

10

before the Hon. P. Michael Duffy, in the United States

11

Courthouse, Courtroom I, 81 Meeting Street, Charleston,

12

South Carolina, 29401.

13

14

15

APPEARANCES:

16

                MICHAEL RHETT DeHART, ESQUIRE, Office of the
17          U.S. Attorney, P.O. Box 978, Charleston, SC,
            appeared for the Government.
18
            DAVID P. McCANN, ESQUIRE, P.O. Box 116,
19          Charleston, SC, appeared for defendant.

20

21

22

23          REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
          Official Court Reporter for the U.S. District Court
24                        P.O. Box 835
                    Charleston, SC  29402
25                     843/723-2208

1              MR. DeHART:  The Government calls the case of United

2      States of America versus Fernando Rivas, Criminal

3      No. 2:11-2290.

4          Your Honor, we call this case for purposes of sentencing.

5      The defendant's present, and is represented by David McCann.

6              THE COURT:  Thank you very much.

7          For the record, Mr. Rivas appeared in court December 6,

8      2012; at that time he entered a guilty plea to count one of an

9      indictment charging production of child pornography, and to

10     count two, transportation of child pornography.

11         At that point a presentence report was prepared at my

12     request, and distributed to the parties.  The parties have

13     received the report.  The Government has no objections to the

14     report; the defendant has filed some objections to the report.

15         Mr. McCann, would you like to advise the Court which of

16     those are viable and which you'd like to argue?

17             MR. McCANN:  Yes, Your Honor.  I've been in touch

18     with Miss Barr from Probation and counsel from the Government,

19     and as to my objections as to paragraphs -- page two

20     objections, or requests for additions, those have all been

21     done; I'm satisfied with the revised presentence report.

22         Paragraph 15 is withdrawn because my request was granted,

23     as was 24 and 25, Your Honor.  So those have been corrected as

24     I wished into the presentence report.

25         Paragraph 28 --

1          THE COURT:  Hold on, let me catch up with you.

2    Objection one, as I see it, deals with paragraph 15.

3    Objection two deals with paragraph 24, and what was your

4    statement regarding that?

5          MR. McCANN:  As to paragraph 24, Your Honor, my

6    objection was to the assertion that pornographic images of the

7    victim had been sent to the CW in New Jersey.  And I think it

8    was established at the suppression hearing that photographs of

9    the victim had been sent to the CW in New Jersey, but they

10    were not the pornographic ones, they were the child clothed

11    and not in a --

12          THE COURT:  All right, so that's been changed, so you

13    have no objection to it; is that what you said?

14          MR. McCANN:  Correct.  Correct.

15          THE COURT:  Okay.

16          MR. McCANN:  Paragraph 28 has to do with the images.

17    Your Honor, my concern was the question of unique images and

18    duplicates, there were a good number of duplicates here.  We

19    had someone analyze the FBI records independent of the FBI,

20    and the 2000 is an accurate number.  So we withdraw that

21    objection, Your Honor.

22          THE COURT:  Thank you, sir.

23          MR. McCANN:  Thirty, I think has been satisfied, so I

24    don't think that objection needs to be heard.

25          THE COURT:  All right.

1          MR. McCANN:  Forty-four, I talked with the Government

2     about the fact that -- and this relates to contact under the

3     guidelines with a victim.  I discussed with Probation and with

4     Mr. DeHart that my client has passed a private polygraph and

5     polygraphs with Dr. Burke that says there's been no sexual

6     contact with this child or any child.  And I don't know quite

7     what the Government's position is going to be on 44.

8          THE COURT:  All right.  Yes, sir?

9          MR. DeHART:  May it please the Court, Your Honor.  As

10    to paragraph 44, it's a two level enhancement that Mr. Rivas

11    received because the offense involved sexual contact.  And,

12    Your Honor, I think one of the confusions here is the

13    definition of sexual contact is quite a bit broader than the

14    definition of molestation.  Judge, under 18 U.S.C. 2246,

15    sexual contact is defined broadly, and includes, quote, "The

16    intentional touching either directly or through the clothing

17    of the genitalia, inner thigh or buttocks, with the intent to

18    arouse a sexual desire of any person."  That's quite broad.

19    That's far broader than actually molesting the child.

20         And I would note when Mr. Rivas was interviewed by the FBI

21    during the search of his house, he admitted to touching the

22    victim on the buttocks and caressing her while she was nude in

23    the bath.

24         In addition, Your Honor, you also know that during some of

25    the pictures she was handcuffed in black handcuffs.

1     Your Honor, I think this definitely meets the definition

2 of intentional touching, either directly or indirectly through

3 the clothing.

4     Having said that, Your Honor, other than his admission, we

5 don't have any evidence of that; his admission is all we have.

6 If you wanted to sustain the objection, Your Honor, it would

7 lower his offense level to a 41 from a 43.  I'll leave that up

8 to Your Honor.  We'll defer to the Court, Judge.  It appears

9 to apply, but if Your Honor wanted to protect the record, we

10 understand that as well.

11          THE COURT:  Thank you.  Anything further you'd like

12 to say on it, Mr. McCann?

13          MR. McCANN:  No, nothing, Your Honor.

14          THE COURT:  It's a close call factually in this

15 situation.  Mr. DeHart is right, it's a very broad statute.  I

16 think that given the facts of the case, without my expounding

17 on them any further, I think it is covered by the statute,

18 and, therefore, the objection is overruled.

19          MR. McCANN:  Your Honor, as to paragraphs 54 --

20          THE COURT:  Wait a minute.  You know, I might should

21 be more forthcoming on the record for that ruling, Mr. McCann,

22 forgive me.

23     Not only the conduct that Mr. DeHart described would

24 qualify, in my opinion, but the manner in which the photograph

25 was taken would qualify, and he's spoken somewhat to that.

1    Go ahead, Mr. McCann.

2        MR. McCANN:  Paragraphs 54, my objection was that

3    there was no thing of value.  And I understand that the

4    Probation -- I understand and respect Probation's response, so

5    I withdraw 54.

6        Fifty-seven has to do with an enhancement for the use of a

7    computer.  This day and age, a computer is used for

8    everything.  I don't think that's particularly out of the

9    ordinary in any case, whether it be a case of this type, or

10   communicating about criminal behavior in any other case.  So I

11   think it's a bit of piling on or adding on to the guidelines,

12   and ask the Court to consider that.

13       THE COURT:  Would the Government like to be heard as

14   to that?

15       MR. DeHART:  Yes, Your Honor.  In fairness,

16   Mr. McCann has a good point, and 99 percent of child

17   pornography cases these days do involve a use of a computer.

18   This does seem redundant.  I know there's a District Court

19   Judge in Columbia that chooses not to apply this enhancement.

20   On the one hand, Your Honor, it clearly applies; on the other

21   hand, if Your Honor wanted to vary downward two levels, we

22   would understand, we wouldn't oppose that.

23       If you do that, Your Honor, it would lower his offense

24   level to a 41 from a 43, and it would lower his guideline

25   range to 324 to 405 months.

1    Again, Your Honor, I will defer to you.  I do know that

2    other district judges have chosen not to apply this

3    enhancement.

4         THE COURT:  I think it's probably piling on.  I'm

5    going to sustain that objection.

6         MR. McCANN:  Paragraph 72, as stated, I just wanted

7    that added in and it's been added in.  I'm satisfied with what

8    Probation did.

9    I objected in 85 to the guideline range, hoping that some

10   of these objections would be honored, so it has changed a bit.

11   Paragraph 87, Judge, is the plea agreement.  I asked if it

12   had any possible effect on a mandatory minimum sentence, and I

13   think it does, and I intend to argue that; that's the purpose

14   of that objection.

15   Paragraph 99 covers the fact that Mr. Rivas has provided,

16   along with his wife, for the well-being of his relatives.

17   Paragraph 100, as stated in 87, the Court does have the

18   power to go below the mandatory minimum in this case.

19   And 101 just repeats what was stated in 100.

20   That's all I have, Judge.

21        THE COURT:  Mr. DeHart?

22        MR. DeHART:  No, Your Honor, we defer to the Court.

23   I would ask, Judge, if you're going to sustain the objection

24   to the use of computer, just to put on the record his new

25   guideline range.  I'm happy to read it to Your Honor.

1          THE COURT:  I think the probation office wants to be

2     heard on that.  Go ahead.

3          PROBATION OFFICER:  Your Honor, even sustaining that,

4     the cross-reference back to count one supersedes that, so the

5     guidelines would not change.

6          THE COURT:  Okay.  I granted it, and so that without

7     the cross-reference, as Mr. DeHart said, the guidelines would

8     change from 43 to 41, and the range would change from 324

9     months to 405 months.  But with the cross-reference, it does

10     not change.  So we'll get to those guidelines which includes

11     the cross-reference in a moment.

12          The other objections are overruled or withdrawn.

13          The guidelines call for a total offense level of 43,

14     criminal history category is one.  The defendant is not

15     eligible for probation.  A term of incarceration is life

16     imprisonment.  If the sentence imposed on a count carrying the

17     highest statutory maximum is less than the total punishment,

18     then the sentence imposed on one or more of the other counts

19     shall run consecutively, but only to the extent necessary to

20     produce the combined sentence equal to the total punishment.

21          In this case count one and count two shall run

22     consecutively, thereby providing a total punishment of 600

23     months, which is 50 years.

24          There's five years to life supervised release term, 25,000

25     to $250,000 fine.  Restitution is not an issue in the case.

1    There's a $200 special assessment fee.

2        Any additional objections that have not heretofore been

3    addressed?

4            MR. DeHART:  No, Your Honor.

5            MR. McCANN:  No, sir.

6            THE COURT:  I'll consider those guidelines together

7    with the statutory -- excuse me -- yeah, the sentencing

8    factors under 3553 of Title 18 of the U.S. Code.  I'd ask the

9    clerk to make the presentence report part of the record of

10   this hearing.  It will remain under seal unless it's needed

11   for appellate purposes.

12       The recommendation to the Court from the probation officer

13   will remain under seal until further order of the Court.

14       Since there are no objections to the factual statements in

15   the presentence report, I'll adopt those statements as the

16   Court's finding of fact for purposes of this hearing.

17       Does anyone object to my doing so?

18           MR. DeHART:  No, Your Honor.

19           MR. McCANN:  No, sir.

20           THE COURT:  Thank you.  I'll hear from the Government

21   and then from the defendant regarding sentence.  It's my

22   understanding that the defense wishes to call some expert

23   witnesses.

24       Does the Government have any live testimony it's going to

25   present?

1          MR. DeHART:  No, Your Honor.  We do have Agent Grange

2     of the case.  If need be, we'll call him as a witness, but at

3     this time we don't see a need for that, but he is available.

4          THE COURT:  All right, Mr. McCann, would you like the

5     Government to make whatever statement it has regarding

6     sentencing, or would you like to go ahead and present your

7     witnesses?

8          MR. McCANN:  Please the Court, I'd like to go ahead

9     and present what we have, and then if the Court wishes, okay

10    with the Court, then you can hear what our positions are at

11    sentencing at the end.

12         THE COURT:  That would be fine.  Thank you.

13         MR. McCANN:  Your Honor, some housekeeping matters.

14    I sent up to you directly, seven letters from people in the

15    community and elsewhere who know my client, and I -- The Court

16    received those?

17         THE COURT:  I've received them and I've read them and

18    I'll make them part of the record.

19         MR. McCANN:  Thank you.  One of the individuals that

20    wrote a letter, Mr. Cisneros, is here, and he'd like, at the

21    appropriate time, to address the Court.

22         THE COURT:  Be glad to hear from him.

23         MR. McCANN:  Your Honor, my sentencing memorandum was

24    filed along with the addendum, and was not placed under seal

25    or made a court document, and I would ask -- a court

1    exhibit -- and I'd ask the Court to do that, please.

2            THE COURT:  I'll do that for the same reason the

3    Government moved.  It's granted.

4            MR. McCANN:  Thank you.  Your Honor, my first witness

5    is going to be Dr. William Burke, who the Court knows.  He has

6    testified in this court before as an expert.  I discussed his

7    credentials with Mr. DeHart, and Mr. DeHart is not opposed to

8    him being qualified in this case as an expert in the matters

9    we're here to discuss.

10            THE COURT:  I recognize the doctor as an expert.

11            MR. McCANN:  Your Honor, as a prelude to calling

12    Dr. Burke, I'd like to give you some history on what happened

13    with Mr. Rivas.  He was arrested on April 19, 2011, by a

14    combination of local authorities, North Charleston authorities

15    and the FBI.  Upon his arrest, came into his house, and there

16    was a large team in this search party.  He sat down with them,

17    and I believe on a state form, made a confession.  It is clear

18    to me that he knew that day was going to come.  And, in fact,

19    he told the agents that it was a blessing what they had

20    arrived, he was glad that they had come, he knew he was at a

21    point in his life where he was in control of some forces he

22    couldn't control.

23        Your Honor, after Mr. Rivas was in county jail for three

24    weeks on the state charge, he was released, he hired me.  He

25    was sent to receive an assessment at MUSC.  Once that was

WILLIAM BURKE - DIRECT EXAMINATION

1   received, the recommendation was he be treated by Dr. Burke.

2        Dr. Burke, thereafter, started treating him, has been

3   treating him for over a year, as is reflected in Dr. Burke's

4   report, which is part of my sentencing -- well, it's attached

5   to the presentence report actually.

6        With that history in mind, Judge, I'd like to call Dr.

7   Burke and go through with him his treatment of Mr. Rivas.

8             THE COURT:  Please do.

9             THE CLERK:  State your full name.

10  A.   William Henry Burke.

11       WILLIAM BURKE, a witness called by the defendant, first

12  having been duly sworn, testified as follows:

13                      DIRECT EXAMINATION

14  BY MR. McCANN:

15  Q.   State your full name for record and your profession,

16  please.

17  A.   William Henry Burke.  I am in private practice with

18  Southeastern Assessments, which is a company that specializes

19  in the assessment and treatment of people with sexual

20  disorders.  I'm also an associate professor of forensic

21  psychiatry at the Medical University of South Carolina.  And

22  in my capacity in that position, I provide treatment to

23  impaired physicians, impaired professionals with sexual

24  disorders, and am involved with multiple research projects at

25  MUSC.

WILLIAM BURKE - DIRECT EXAMINATION

1   Q.   How long have you been in this profession, Doctor?

2   A.   Full-time since 1989.  Prior to that I've always had some

3   clinical work or clinical capacity with sex offenders, dating

4   back to 1981, when I first started as a counselor at MUSC.

5   Q.   Did you attend college here in Charleston?

6   A.   I was a graduate of the Citadel in 1980.  I received a

7   master's degree in clinical counseling from the Citadel in

8   1984.  And I received a Ph.D. in counseling from the

9   Department of Educational Psychology at the University of

10  South Carolina.

11  Q.   You can refer to your report, Doctor, if you like.  I have

12  your report that has two dates on it, August 3rd, 2012 and

13  August 9th, 2013.  Now, the August 3rd, 2012 date reflects

14  what, Doctor?

15  A.   The first contact I had with Mr. Rivas to start the

16  assessment process, and the second date was roughly a year

17  later I added an addendum to the report about the number of

18  hours he had had treatment.

19  Q.   Has Mr. Rivas been a patient of yours continuously for the

20  time period reflected in your report?

21  A.   Yes, sir.

22  Q.   Up until today, as a matter of fact?

23  A.   Yes, sir.

24  Q.   And has appointments scheduled down the road with you, is

25  that correct?

WILLIAM BURKE - DIRECT EXAMINATION

1  A.  Yes, sir.

2  Q.  Now, tell the Court about what the assessment process is

3  with a patient like Mr. Rivas.

4  A.  Well, we follow the standards of care as established by

5  the Association for the Treatment of Sexual Abusers, which is

6  an international organization based in America.  And so

7  there's a specific protocol you're required to follow, and we

8  follow that protocol.  It includes, among other things,

9  specific guided interviews, review of documents, standard

10 psychological testing that one could get at practically any

11 psychology or counseling office.  And then some specific

12 testing directed at sexual interests and sexual arousal

13 through some laboratory equipment that we have.

14 Q.  Now, how long does the assessment process take, how many

15 meetings with the patients?

16 A.  Depends on the person.  I mean, sometimes when we're

17 cramped for time, if I have somebody coming from Spartanburg

18 to evaluate, we'll have them 12 or 14 hours, and try to get it

19 all done in one day.  But typically like to break it up

20 somewhat, so it takes -- well, it's a total of at least 14

21 hours of their time and mine, and my staff.

22 Q.  Was that the case with Mr. Rivas?

23 A.  Yes, sir.

24 Q.  And the purpose of an assessment is to determine what the

25 needs are and how to treat them?

WILLIAM BURKE - DIRECT EXAMINATION

A.  Well, two things.  Primarily it's a risk assessment to
make a determination as to how -- what level of risk the
person presents to the general public.  And then secondary to
that are the specific treatment needs that need to be
addressed.

Q.  And following the assessment of Mr. Rivas, did you make a
determination of what problems he presented and how you were
going to treat them?

A.  Yes, sir.  I did.

Q.  And what were those?

A.  Well, I think it's important to understand how Mr. Rivas
got to where he ended up with these charges.  And it, I
believe, directly is associated with his experiences through
childhood, which are quite extraordinary.  You know, I must
say, I've been doing this quite awhile, and I've not had this
kind of history come across my desk before.

    I think it's important to understand that because of what
he was exposed to during the revolution in Cuba, he, during
Castro's takeover, he was exposed to some pretty extraordinary
events, and a climate that was a mix of hyperreligiosity and
abuse by his mother, and death and destruction and
dismemberment that he was exposed to because of the
revolution.

    He, among other events, his mother would threaten to cut
off his penis with a knife if she found him touching himself

WILLIAM BURKE – DIRECT EXAMINATION

1    in any way.  His mother had the rather unique and horrific

2    experience of her first husband being taken away while they

3    lived in Spain during the Spanish revolution, and summarily

4    executed by a local priest and some other people, associates.

5    So she fled to Cuba, where he second husband was taken into

6    custody and brutally tortured, and apparently died later

7    because of that exposure to a left wing organization with

8    Castro.

9        So his mother was hyperreligious, very demanding and

10   domineering.

11       When, during the Cuban revolution, one of the things that

12   Mr. Rivas was exposed to was people being shot and killed in

13   front of him, dead bodies in the street, people fleeing and

14   hiding in his apartment where he lived with his mother.

15       His father owned a grocery store and ran it, and Castro's

16   revolutionary guard took him into custody and took possession

17   of the grocery store.

18       Part of what Mr. Rivas also was exposed to was propaganda

19   material from both sides of the left and right wing factions

20   in Cuba.  There were images of people being dismembered,

21   people being tortured.  And on the same -- or across from that

22   same page would be the picture of a woman in a bathing suit.

23   And so it was sort of a confusing process as a young three-,

24   four-, five-year-old boy to be looking at this material.

25       He began a process that is known in the literature as --

WILLIAM BURKE – DIRECT EXAMINATION

1    Pardon me, Your Honor, I need to get a little bit graphic --

2         THE COURT:  Go ahead.

3    A.  -- to explain this.  It's called self-soothing

4    masturbation that most humans do, particularly when they're

5    young.  And there's a rather broad definition of masturbation.

6    It certainly includes what one would commonly think of

7    masturbation of rubbing yourself until you have an orgasm, but

8    it also includes things like just touching, caressing, a child

9    grinding into a pillow with their genitals or into the bed

10   mattress.  It feels good physically and it reduces anxiety.

11        The problem that occurs, and we deal with this all the

12   time with people with sexual disorders, is the things that

13   you're anxious and fearful of when you're laying in bed as a

14   child worrying, and you begin to self-sooth through

15   masturbatory behavior, you actually build an arousal pattern

16   towards that behavior, towards that abusive behavior, towards

17   that horrific, in this case, sadomasochistic behaviors that

18   have been witnessed.

19        And so you develop an interest.  Mr. Rivas did that

20   through taking pictures of Jane out of the Tarzan comics in

21   the early 60s, and drawing where she had been cut on her body

22   and bound and tied up, which is what he had seen.

23        There was a particularly gruesome event known as the night

24   of the bombs, in which Mr. Rivas and his mother were, I

25   believe in downtown Havana, or certainly somewhere in Cuba, in

WILLIAM BURKE - DIRECT EXAMINATION

1    a theater.  And the area they lived was pro-Batista, they were

2    anti-Castro.  And Castro had pretty much taken over most of

3    the country.  And as a ploy to get some of these men out into

4    the streets who were hiding from his revolutionary guard, he

5    put on a victory parade that includes floats with a lot of

6    women in bikinis on them.  And if you think back to the early

7    1960-1961 time, that was quite provocative in itself.  But the

8    purpose apparently was to have men come out and watch as the

9    parade went by.  And as that occurred, the revolutionary guard

10   set off booms everywhere in the city and killed many people,

11   including the women, some of the women that he had on the

12   floatation on the parade route.

13       Mr. Rivas, his mother heard the explosions, they went

14   outside, saw the chaos, saw a lot of dismembered people and so

15   forth, and they fled and escaped.

16       So this is a very unusual horrific experience that I

17   think -- I'm not making any excuse for Mr. Rivas' behavior,

18   but I am telling you what my belief is clinically and

19   professionally is this is how he got there.  It started a

20   pattern of repeated masturbatory behavior with violent

21   fantasies.  And it's a way that a lot of people will -- who do

22   that, it feels a sense of control coming from a position of

23   being in danger all the time and with no control.  So that's

24   one of the things that we focused on.

25       In addition to that, we follow the standards of care as

WILLIAM BURKE - DIRECT EXAMINATION

1   established by ATSA for the treatment of individuals for these

2   kinds of disorders.  And so he has almost completed our 36

3   module -- I think he's completed 32 of the 36 modules that are

4   sex offense specific.  And then we have what we call the good

5   lives model after that, which is 27 modules of things that one

6   can do to replace their deviant sexual behavior, which he's

7   already started to do anyway as part of his treatment.

8   Q.   Now, Doctor, in interviewing Mr. Rivas and talking with me

9   about what the Government's case was all about, were you made

10  aware of the writings by Mr. Rivas and stories he would

11  compose and pictures he would -- you talked about the Tarzan

12  picture, but did he go into those ways of expressing himself

13  and his deviancy?

14  A.   Well, I think clearly -- well, to answer your question,

15  yes, I believe I've read everything that's been made

16  available.  Well, made available to me, that's been available

17  to the Government.  And yourself.  Some of the stories that

18  he's produced.  And I was able to, with the help of the FBI

19  agent -- I can't recall his name -- when I went to Mt.

20  Pleasant I was able to view the images that were downloaded.

21  I didn't view every single image, but I viewed every single

22  image that involved his granddaughter.

23      But I also was able to see some of the process of how

24  he -- for lack of technical knowledge of the field, I'm just

25  going to say Photo Shopped different images together.  There's

WILLIAM BURKE – DIRECT EXAMINATION

1    one that stands out in my mind from that -- with the help of

2    the FBI agent, where there was a young girl, maybe five or

3    six, who was clothed in a leotard, and obviously was doing

4    something that one would do in a gymnasium.  Sort of looked

5    like she was doing a backwards flip, or I think it's called a

6    kip.  And it was displayed how he was able to manipulate the

7    photo to make it look like she was actually naked.  And then

8    he inserted the picture of an adult male to make it look like

9    he was having intercourse with her.  And I'd seen some of the

10   images where he had essentially replicated what he did as a

11   child, by putting cut marks and blood onto pictures of people,

12   primarily children, what I saw.

13   Q.  During the course of your treatment, the assessment and

14   beyond, in your professional opinion was Mr. Rivas being

15   straightforward with you?

16   A.  I believe he was for a number of reasons.  As you've

17   already stated this morning, he expressed when he was

18   investigated initially that he wanted to get help and that he

19   was glad essentially they'd showed up.  His participation has

20   been outstanding.  He, you know, he underwent a sexual history

21   polygraph and then two other compliance polygraphs.  The

22   sexual history polygraph covers every kind of sexual behavior

23   you can think about, a standardized 29-page questionnaire.

24   Which the main issue I wanted to find out about regarding his

25   sexual history was had he molested any children.  And the

WILLIAM BURKE - DIRECT EXAMINATION

1    results of that indicated that he had not.

2        And I utilized Tim Stevenson, who has been federally-

3    trained for sex offender-specific polygraphy.  There's a

4    course, there's a federal course, eight-week course in

5    Kentucky, and he's been doing it for me for like 12 years now,

6    and I've put a lot of faith into his work.

7        It was initially involved with what we call our intensive

8    outpatient program, that it was three to eight hours of

9    therapy per week, that included individual and group therapy,

10   which had been titrated down to one 90-minute group a week,

11   and then he would see me individually every other week.

12       And then, like I say, the two compliance polygraphs which

13   are, you know, are you following the rules and regulations of

14   probation and our treatment program.

15   Q.  Does the compliance polygraphs or any other tests let you

16   know, as a therapist, whether or not he's gone back to the

17   process of masturbation?

18   A.  Yes, sir, that's a specific question, have you masturbated

19   to any deviant fantasies since your last polygraph.  Yes.

20   Q.  And he's tested clear for that since he's been under your

21   care?

22   A.  Yes, sir.

23   Q.  Doctor, in diagnosing what Mr. Rivas' problems are, what

24   did you come up with?

25   A.  The primary diagnosis was narratophelia, which is under

WILLIAM BURKE – DIRECT EXAMINATION

1    the category of paraphelia not otherwise specified.  It is a

2    disorder where one gains arousal, and usually with the

3    intention of achieving orgasm, by writing pornographic

4    material, and with the knowledge that other people are reading

5    it.  It's sort of the opposite of you may notice every once in

6    awhile in the media if a minister or something is caught with

7    a prostitute, oftentimes there's no touching involved, they

8    just want to hear the prostitute talk dirty to them or

9    something like that.  And it's that sort of opposite process;

10   you want to be the producer of this material, and you get

11   turned on by the thought that other people are turned on by

12   it.  That was his primary diagnosis.

13       I think secondary to that, he met the diagnostic criteria

14   for pedophilia.  And certainly one can meet the diagnostic

15   criteria for pedophilia without having sexually touched a

16   child.  But, of course, as we know, he took the pictures of

17   his granddaughter, and then manipulated the other child

18   pornography pictures that he had.

19       He's also been diagnosed with posttraumatic stress

20   disorder secondary to the experiences that he had growing up,

21   primarily in Cuba and then later on in Florida with his mother

22   still being who she was towards him.

23   Q.  I think it's difficult for a lot of people to understand

24   how a man with this start in life, as you've related, can come

25   to the United States, graduated from a well-known high school

WILLIAM BURKE – DIRECT EXAMINATION

1    in Miami, and then went on to Julliard in New York, where he

2    earned a degree in music composition.  All the earmarks of an

3    achiever.  Everything you would want to do in your life or

4    your child's life.  How does this -- these achievements jive,

5    if you will, with what was going on with him since he was a

6    child and ongoing?

7    A.  How do these achievements -- Ask me again.

8    Q.  Well, someone who is an achiever in the normal sense of

9    the word, an overachiever you could say, how can someone be in

10   the normal world, so to speak, and achieve, but is

11   entertaining these deviant thoughts and expressing himself

12   through writings and pictures and so forth.  How do you treat

13   something like that?  Why is that --

14   A.  Well --

15   Q.  How can it happen?

16   A.  It's not uncommon for people to be -- to make great

17   achievements in their life professionally and personally, and

18   still have this other side to them that's very dark, and

19   clearly unhealthy.  And that's -- I always think of the movie

20   Full Metal Jacket when I say this, but, you know, Jung did say

21   there's the duality of man, there's the part of us that do

22   great things and help people and achieve greatness, and

23   there's a dark side to everyone.

24       I think in this case the fact that he's an artist, and

25   when I say he's an artist, his musical achievements have been

WILLIAM BURKE – DIRECT EXAMINATION

1   rather extraordinary, but he's also written plays, he's

2   written novels, and he had just started, since being in

3   treatment with us, just started painting and drawing, which he

4   had not done before.

5   And he's an individual who is just multi-talented from an

6   artistic standpoint.  I think also being an artist, in some

7   ways it influenced part of his paraphelic behavior.  Part of

8   being an artist sometimes is pushing the envelope, and he

9   certainly did that.  And beyond.  But I think that's a

10  component of his personality that he didn't control properly.

11  Q.  To your knowledge, discussing with him his history, life

12  history, did he ever report any of these demons, if you will,

13  to anybody in the course of his life?

14  A.  He did not report it to anyone from the perspective of I

15  need help.  He did share some of these fantasies and certainly

16  posted some of these deviant short stories that he wrote on a

17  specific website where people who are interested in that kind

18  of deviant narrative, so to speak, would post and read each

19  other's material.

20  But if you're wondering has he sought help before, to my

21  knowledge he has not.  And that's one of the difficulties we

22  have in our field, is it's real difficult for somebody to come

23  forward and say I'm addicted to child pornography, I'm doing

24  all the things Mr. Rivas has done, and say I need help.

25  There's mandatory reporting laws that oftentimes are in

WILLIAM BURKE – DIRECT EXAMINATION

1    effect if somebody comes and wants help from a therapist or a

2    doctor, they have to be turned in to law enforcement.  So

3    there's a lot of disincentive to try to reach out to try to

4    get some help.  And I think that played a part, certainly

5    played a part in why he didn't do that.  I mean, he's told me

6    as much.

7    Q.  You talked about group sessions.  Explain for the Court

8    what the benefit is of group sessions and who are in there

9    with Mr. Rivas and what role he may have assumed during the

10   course of these group sessions.

11   A.  Well, we have two kinds of groups.  One is more

12   psychoeducational, where we teach them specific behavioral

13   techniques to suppress deviant arousal, increase appropriate

14   arousal, we do that in a group setting.  And then there's what

15   we call a process group, where you talk about your thoughts,

16   feelings and fantasies and your experiences, and then you hear

17   from other group members, you know, what they're experiencing,

18   what they've learned.  It becomes -- the therapist in the room

19   should really get to a point where they're more of a

20   facilitator than actually leading that process, so they can

21   sort of help themselves.

22       And Mr. Rivas has been very active in that and has assumed

23   a leadership role in that.  Part of that leadership role is

24   being willing to be confronted and accept that appropriately

25   by others, and to confront other people appropriately, and

WILLIAM BURKE - DIRECT EXAMINATION

1    he's been able to do that.  And I think he's been an asset

2    to -- the group that he's in now is, I believe everyone in

3    that group except two guys, there's eight guys, six of them

4    are child pornography, they're convicted of child pornography

5    charges, and either served time or are waiting to get -- some

6    are waiting to go -- haven't been adjudicated yet.  And

7    there's two child molesters in that group.

8    Q.  Doctor, when you talked about his ongoing, Mr. Rivas'

9    ongoing treatment, you talked about certain procedures that I

10   think he's completed; it sounds about like about 80 percent of

11   one and then the next will follow.

12       Is it your professional opinion that Mr. Rivas will need

13   your type of counseling for the rest of his days?

14   A.  I believe so.  I think this is similar, though there are

15   vast differences, it is similar to a drug addiction or alcohol

16   addiction where you have to deal with it the rest of your life

17   on a daily basis.  So yeah, I would agree with that.

18   Q.  You talked earlier, too, about risk, and you reached some

19   conclusions and in your report.  Explain in detail, please, to

20   the Court, how you arrived at your risk assessment as to

21   Mr. Rivas.

22   A.  Well, as part of the whole process, you have this, like I

23   said, standard psychological testing, and then we have

24   actuarial scales which predict risk, or places people in

25   different risk categories over different periods of time.

WILLIAM BURKE – DIRECT EXAMINATION

1    And then we have the physiological testing, which is the

2    penile plethysmograph and the visual sexual preference

3    testing.  His primary psychiatric diagnosis, aside from the

4    sexual disorders, as I mentioned earlier, has been

5    posttraumatic stress disorder.  From an actuarial scale

6    standpoint, and I don't have the report in front of me –– Can

7    I look at that so I make sure I have the right numbers?

8    Okay.  From an actuarial standpoint, I'm referring to page

9    17, I have a review of all three actuarial tables.  Static 99

10   predicts reoffense rates over a 15-year period.  And he scored

11   in low category, which predicts there's a 13 percent chance he

12   would be arrested in the future for a similar crime.

13   The Stable 2007 actuarial scales predicts reoffense rates

14   over a one-year period, and that placed him at 1.5 percent

15   chance of reoffense.  And then the acute can be given every 45

16   days, and that predicted value is like one percent.

17   So you may ask, with the kinds of images and the fact that

18   he took the pictures of his granddaughter, why he would be in

19   a low risk category.  With the Static 99, there are ten areas

20   to assess.  For instance, one is, are you over the age of 25.

21   If you are, that lowers your risk.  Are you married?  That

22   lowers your risk.  Do you have any contact victims outside of

23   your family?  If you don't, that lowers your risk.  So I am

24   issuing informally down that particular scale for the Static

25   99, I believe he got a zero.  Yeah, he did.  Zero.  That's how

WILLIAM BURKE – DIRECT EXAMINATION

1   the actuarial scales play out and predict recidivism.

2       His visual sexual preference test results, which are on

3   page 18, says actually overwhelmingly that his sexual

4   interest, as measured by that instrument, is towards adult

5   females.  Although he had a pedophilic approximation quotient

6   of .54, which means he better matches a pedophile who doesn't

7   have chronic arousal, but also has -- to children -- but has

8   arousal to adults as well.  The higher that approximation

9   score, the more you get towards someone who is only aroused to

10  children and cannot be aroused to adults.

11      So when you have someone who is capable of arousal to

12  adults, if they're heterosexual, as Mr. Rivas is, he's aroused

13  to adult females, I think he situationally is aroused to

14  children, particularly female children.

15      And then we've given him two penile plethysmograph exams.

16  He had one previously at the Medical University before he came

17  to us.  And all three results are what we call flatlined.  I

18  mean, he didn't respond to anything.  Which is not unusual.

19  It's a very intimidating process to be placed in a room by

20  yourself and put a gauge on your penis and other parts of your

21  body so things can be monitored by somebody on the other side

22  of a wall.  But usually, you know, after two or three times

23  you might get something, as they become more acclimated to the

24  process, but that just didn't occur.

25      And so I guess I'm -- in effect how I came up with this

WILLIAM BURKE - DIRECT EXAMINATION

1  level of risk is by following the standards of care, using the

2  actuarial scales that predict recidivism, and then with the

3  physiological testing.  If the physiological testing had shown

4  chronic arousal to children, like on the visual sexual

5  preference test, that would have elevated his risk.  If he'd

6  have had arousal to children in the PPG lab, that would have

7  elevated his risk.  But beyond those two factors, I don't

8  think there's anything else in the report that would have

9  elevated it or -- during the assessment process that would

10  have elevated his risk.

11  Q.  Doctor, during the course of your treatment, and this is

12  coming from a layman, do you attempt and do you do, instruct

13  or guide a patient in how to cope with these temptations that

14  are surely, as you said, on a daily basis may reappear.  What

15  coping measures or techniques do you impart to your patient?

16  A.  Yes, sir, that's part of the 36 modules.  But among them

17  are what are known as aversion therapy, where the individual

18  attempts to become aroused to something deviant, deviant

19  fantasy, sometimes we can provide that for them in the

20  laboratory.  And as they start to become aroused, they

21  easily -- I think in Mr. Rivas' case he only used ammonia

22  smelling salt capsules to pare the arousal cycle with a

23  noxious stimulus, which he did over 100 minutes of that.  He

24  did ten tapes, ten minutes each.  We have them audio tape

25  these, so we actually know they're doing the homework.  And

WILLIAM BURKE - DIRECT EXAMINATION

1      then we go over them in group.

2          He also did ten 15-minute tapes of what's known as covert

3      sensitization, which is a process of teaching someone how to

4      think differently with stimuluses they're subjected to in the

5      environment.  And then we have what we call satiation therapy,

6      where the person is instructed to, at home alone, masturbate

7      to an appropriate fantasy until they have an orgasm, and then

8      switch to a deviant fantasy immediately afterwards for a

9      period of time.  What that does is extinguishes any arousal

10     very effectively.  Those three things together are very

11     effective at reducing deviant arousal while enhancing

12     appropriate arousal.

13     Q.  Will these therapies be required of Mr. Rivas in his

14     continued care?  Again, as long as you or any other

15     professional would be treating him?

16     A.  Well, the course that's suggested, you know, in the

17     literature, is yes.  That, for instance, with aversion

18     therapy, not only are you redirecting their arousal process to

19     become, you know, have a visceral reaction to it that's

20     negative, you also have the capability of whenever you're in

21     the environment and you start thinking deviantly, you can take

22     an ammonia capsule, or Valproic is another sort of cream you

23     can have the apothecary or the pharmacist make for you, to

24     stop yourself.  You know, you really don't have a process

25     usually where you can stop what you're doing and call

WILLIAM BURKE - DIRECT EXAMINATION

1    somebody.  You may be able to do that, but what's more quick,

2    what's quicker and more effective is if you're able to stop

3    that arousal cycle as you find yourself falling into that

4    pattern.

5        But I guess to answer your question, yeah, the literature

6    suggests that aversion therapy should be repeated every nine

7    months for the rest of your life.

8    Q.   Now, the remaining sessions, you didn't use the term

9    sessions, but in this first phase of treatment what was the

10   term you used to describe him?

11   A.   Treatment modules.

12   Q.   Modules.  And you say you have how many more left in the

13   regimen for Mr. Rivas?

14   A.   Well, in the initial 36, he has four left.  And then we

15   have -- beyond that we have what we call the good lives model

16   approach, where you take specific components of a person's

17   life, everything from self-agency, managing yourself,

18   spirituality, physical fitness, nine different categories.  As

19   I stated earlier, he's already started on his own, he started

20   doing that with some of his artwork and so forth.

21       So what the program consists of you address the deviant

22   arousal and thinking patterns with the traditional

23   psychotherapy models that have been around for like 15 years

24   now and are effective.

25       In addition to that, it's been viewed in the literature

WILLIAM BURKE – DIRECT EXAMINATION

1    that it's all negative.  It's like, okay, you can't have a

2    deviant fantasy, you can't look at another woman, you can't do

3    this, you can't do that.  So the good lives approach changes,

4    well, here, to the perspective that, okay, these are the

5    things I can do that are positive and that I can get positive

6    feedback and enjoyment out of that can fill my time much more

7    appropriately and in a more healthy manner than falling back

8    into the deviant behavior from the past.

9    Q.  And what's the time frame between going from one module to

10   the next?  What I'm getting at is how much more time do you

11   need to finish the first phase of that or last modules?

12   A.  Well, it depends on the module and depends on the person.

13   He, you know, he's actually worked very fast.  I mean, our

14   program is designed for two and a half years, the 36-module

15   component is a two-and-a-half-year process.  So he's worked

16   very hard to get where he is.

17        To finish the last four, which are impulse control

18   modules, couple of two or three months, I would imagine.  I

19   mean, I think that's a fair estimate, given how his track

20   record has been, you know, with his work production.

21   Q.  Now, Doctor, I think it's clear that Mr. Rivas is going to

22   have to do some amount of committed sentence in a federal

23   facility.  We've all heard of Butner.  You've heard of a place

24   in Massachusetts called Devens, I think it is.  Have you had

25   patients in the past that have gone to Butner and have sought

WILLIAM BURKE - DIRECT EXAMINATION

1  care and got some degree of care while there?

2  A.  Yes, sir.

3  Q.  And would you recommend that as being a facility, since

4  it's a hospital setting as well, that would benefit as much as

5  it could, Mr. Rivas on down?

6  A.  Yes, sir, it would.

7  Q.  Is there anything else you care to offer, Doctor, that I

8  have not asked but Mr. Rivas' case?

9  A.  Well, I will say this.  That I have nothing but the

10  greatest respect for my colleagues who treat sex offenders in

11  the federal system.  I know a lot of them personally.  There's

12  one from Butner who is Dr. William Burke, we're not related in

13  any way, but so I've had multiple conversations with him.

14  They do great work.  However, they are so terribly restricted

15  by outside forces that, in my opinion, the effectiveness is

16  dampened considerably.

17      To give you an example of what I'm talking about, they

18  published some research about five years ago that certain

19  kinds of offenders had more contact victims than the others,

20  said child pornography possession people had more contact

21  victims than people with just one conviction of child

22  molestation.  And that was done -- the data was gathered

23  through polygraph exams of the guys at Butner.  Valuable

24  information, nothing really -- I thought it was a great study.

25  The Government's response to that was to throw it out, to say

WILLIAM BURKE - DIRECT EXAMINATION

1    it was invalid research, because, it seemed to me, they didn't

2    like the result.  That's my humble opinion on what I've

3    observed.  And in speaking with the other doctors, they seem

4    suppressed in doing -- what they feel they need to do to

5    provide treatment is suppressed because of different dynamics

6    from different factions inside and outside the Government,

7    that you can't have too many of this or too many of that.

8    It's a long story, but --

9        So my concern is he'll get some care, he'll get some good

10   care, but I mean, some of the things that we've talked about

11   that we do in our program, which are actually standard of care

12   and beyond, he's not going to get.

13       And so then you have to be concerned about, you know, when

14   someone's under stress, incarcerated for a long period of time

15   without access to effective care, you may then relapse back

16   into old behaviors that got you through.  And in his case,

17   like it or not, what he did was horrific, but how he got to

18   that point was through his life experience.  And that process

19   of self-soothing masturbatory behavior kept him going.  That's

20   how he coped in a very horrific situation.  So that's

21   something that is ingrained.  That without proper follow-up, I

22   think can be problematic.  That he could fall back into.

23       MR. McCANN:  Doctor, thank you.  Answer any questions

24   counsel or the Court may have.

25       THE COURT:  Mr. DeHart, before you start, let me get

WILLIAM BURKE - CROSS-EXAMINATION

1   the lawyers in the next case to come up here for a moment,

2   please.

3       (Brief interruption in proceedings.)

4                      CROSS-EXAMINATION

5   BY MR. DeHART:

6   Q.  Do you have your report in your hand?  Ask you a question

7   about page 21 of the report.  Dr. Burke, you, in the

8   conclusion section of page 21 you noted that Mr. Rivas, quote,

9   "failed to demonstrate significant sexual arousal to any

10  stimulus during the PPG exam."  End quote.

11      Did this result surprise you, given how much child

12  pornography he possessed?

13  A.  Well, I can't say I was surprised, because I mean, I see

14  this a lot.  Particularly in older -- the older a guy gets,

15  the less responsive he is to PPG.

16      I did, you know, have access to his initial PPG at MUSC.

17  And then the second -- this is the second one that's in here.

18  The third one we did is almost identical.  So I was hoping

19  that between the three of them, I would get a, you know, some

20  sort of response, but that didn't occur.

21  Q.  Now, could any prescription medications affect the PPG?

22  A.  Yes, sir.

23  Q.  And you told me over the weekend that Mr. Rivas was taking

24  a beta blocker for hypertension.

25  A.  Yes, sir.

WILLIAM BURKE - CROSS-EXAMINATION

1    Q.  Could that affect the exam?

2    A.  It could affect -- a beta blocker, I'm not a physician,

3    but I'm on one, I'm on a beta blocker, it's like a governor,

4    it won't allow your heart rate typically to go over 120 to 130

5    beats a minute.  So it can certainly suppress your heart rate.

6         The thing about the PPG, the first ten to 20 percent of an

7    arousal response, the patient is not even aware that it's

8    occurring.  Oftentimes when we have someone will have like a

9    ten percent increase, which is positive for sexual arousal,

10   you'll ask them how do you think you did on the test, and he

11   said, I'm not going to have one.  And it's not that -- it's a

12   misperception to think that somebody gets a full erection

13   every time they go in a laboratory.  That really only happens

14   in younger guys, it seems.

15        But so what, you know, the ten to 20 percent that we're

16   looking for positive arousal is not really even detectable by

17   the patient himself.

18        But getting back to blood pressure medicine, it does

19   suppress a heart rate, but it doesn't suppress blood flow per

20   se to your penis, which is what the PPG measures.

21   Q.  Now, Dr. Burke, were you aware that when Mr. Rivas was

22   interviewed by Agent Granger during the search, that he told

23   the FBI that he had a sexual interest in females ages four

24   through 55?

25   A.  Yes, sir.

WILLIAM BURKE - CROSS-EXAMINATION

1  Q.  And isn't this admission somewhat inconsistent with the

2  PPG exam results?

3  A.  It is, but I did diagnose him with pedophilia, so it

4  wouldn't change the diagnosis at all.

5  Q.  And not to beat a dead horse, but are you aware Mr. Rivas

6  wrote many fictional stories involving sex and violence?

7  A.  Yes.

8  Q.  And you read some of those stories?

9  A.  Yes, sir, I have.

10  Q.  And aren't those sexual stories, again, somewhat

11  inconsistent with the exam?

12  A.  They're -- well, inconsistent with the exam --

13  Q.  With the results of his exam.

14  A.  Well, there are no results, so --

15  Q.  The lack of results.

16          THE COURT:  Let me stop you a minute and ask a

17  question that may help clarify, that might clarify the record.

18  First of all, let's establish what the test showed.  Are you

19  saying because of lack of a response, it was not a valid test?

20  A.  Yes, sir.

21          THE COURT:  Okay.  Go ahead.

22          MR. DeHART:  But to be precise, Judge Duffy.

23  BY MR. DeHART:

24  Q.  Dr. Burke, you noted in your report that, "Rivas failed to

25  demonstrate significant sexual arousal to any stimulus."

WILLIAM BURKE – CROSS-EXAMINATION

1  A.  Correct.

2  Q.  Children, adults, anything.

3  A.  Correct.  Now, you know, in this particular test there are

4  nude images of adult men and women, very attractive people,

5  okay, there are no nude images of children.  There are

6  children in bathing suits.  So I mean, really the hope is,

7  from a treatment perspective, that someone would show arousal

8  to the nude adults maybe, more than to children, if they are

9  aroused to children at the same time.  But he just didn't

10  respond.  Depending on the research, you know, and depending

11  on the stimulus materials presented, it's like 18 to

12  30 percent of the population doesn't respond to PPG, for

13  males.  They just flatline.

14  Q.  Okay.  Dr. Burke, are you aware that Rivas, throughout the

15  course of this crime, sent child pornography to other persons

16  on the Internet?

17  A.  Yes.

18  Q.  And are you aware that one of the persons to whom he sent

19  child pornography was arrested for attempting to buy a child

20  prostitute?

21  A.  Yes, sir.

22  Q.  And you would admit, would you not, sir, that it is

23  dangerous to send child pornography to other persons?

24  A.  Yes, sir.

25  Q.  Regardless of whether a person who sends it is in actual

WILLIAM BURKE - CROSS-EXAMINATION

1  danger.

2  A.  Yes.

3  Q.  The sending of child pornography is dangerous.  And would

4  you admit, Dr. Burke, that child pornography can lead some

5  adults to actually molest children?

6  A.  Yes, sir.

7  Q.  And this is one reason that distributing child pornography

8  is illegal, correct?

9  A.  Yes, sir.

10  Q.  You don't know who they send it to, what they may do with

11  it.

12  A.  Yes, sir.

13  Q.  Now, Dr. Burke, can this disorder -- and this is somewhat

14  speculative -- can this disorder, his diagnosis of pedophilia

15  influence his occupation?

16  A.  Well, I wondered about that.  He really didn't have -- he

17  had no access to children.  In fact --

18  Q.  He taught at Porter Gaud Middle School, did he not?

19  A.  Yes, sir, he did.  I thought you were referring to the

20  Disney connection.

21  Q.  Just let me step back a moment.  Mr. Rivas produced music

22  for Disney's Sesame Street show, correct?

23  A.  Yes, sir, for Sesame Street and Disney.  They were

24  separate entities.

25  Q.  So he produced music for Sesame Street, and he produced

WILLIAM BURKE - CROSS-EXAMINATION

1    music for Disney's Handy Manny show, correct?

2    A.  Yes, sir.

3    Q.  And he taught at Porter Gaud Middle School for six or

4    seven years, correct?

5    A.  Yes.

6    Q.  Now, we're not trying to suggest that he did anything

7    inappropriate in those occupations; my question is more just a

8    big picture general question.  Could his pedophilia influence

9    his career choices?

10   A.  Well, correct me if I'm wrong, I believe at Porter Gaud he

11   taught seventh and eighth graders, or -- I need some direction

12   on that.  Can I ask that?

13          THE COURT:  Yeah, you can ask.

14   A.  What were the ages?

15   Q.  I believe middle school, and I believe that's

16   consistent with --

17   A.  All right, okay.  Well, that doesn't meet the definition

18   of pedophilia, that's -- if he were aroused to adolescents, it

19   would be ephebophelia.  And so --

20   Q.  I'm not trying to trick you, Doctor, forgive me.

21   A.  I know you're not.

22   Q.  I'm just wondering.  It just seems odd that --

23   A.  No, no, I understand.  Yeah.  Well, that's why, you

24   know --

25   Q.  What were your thoughts?

WILLIAM BURKE - CROSS-EXAMINATION

1  A.  Well, yeah, you have to wonder that, and so that's why we

2  had him polygraphed for sexual history.  You know, if you

3  produce child pornography and send it somewhere, yeah, you

4  have to be concerned and wonder if someone has, you know,

5  abused children.  Other than, you know, the one involved with

6  the -- in this case his granddaughter, and anyone beyond that,

7  you have to wonder that.  And that's why we polygraphed him.

8  Q.  Yeah.  And I'm not trying to suggest that he used those

9  positions to actually act out; our question is more of a

10  general one.  You think it attracted him to these occupations?

11  A.  I don't think it attracted him to Porter Gaud, because the

12  stuff I read and the stuff I saw were much younger than

13  seventh and eighth graders.

14  Q.  They do have -- Porter Gaud has an elementary school as

15  well, same campus, right?

16  A.  Correct.

17  Q.  Sesame Street are young kids, Disney is young kids.

18  A.  Right.  But if I can just clarify about like Disney, it's

19  not that he went to Disney and said, I want to do these things

20  for you, for children.  He submitted, through a production

21  company, just samples of his work, and Disney anonymously

22  initially took his work, said, hey, we like this.  And he

23  didn't realize it was Disney until contract time was signed

24  later on.

25  Q.  He realized it was a children's show though, I mean,

WILLIAM BURKE - CROSS-EXAMINATION

1    Sesame Street is one program, that's a children's show, right?

2    A.  Right.

3    Q.  And Handy Manny for Disney is a children's show, right?

4    A.  Right.

5    Q.  I'm not picking on Mr. Rivas, but there's not a huge doubt

6    while he's composing this music whether it's for an adult show

7    or a children's show.  They were children's songs, correct?

8    A.  Well, how this -- how I've come to understand the process,

9    and I'm not an expert, is there's a production company, and

10   you'll join that company.  And the one that he's joined is

11   called Taxi.  And you -- anyone will get an -- if you belong

12   to Taxi, they'll say we need a country song that sounds like

13   Garth Brooks.  And you submit stuff.  So it's what the company

14   asked you to produce.  So I know he's produced other things

15   that -- one thing was supposed go to off Broadway, which was

16   totally adults.

17          MR. DeHART:  Judge Duffy, we don't have any further

18   questions, Your Honor.

19          THE COURT:  Thank you.  Doctor, if you don't mind, I

20   have a couple questions for you.

21   A.  Yes, sir.

22          THE COURT:  It's been touched on a little bit by

23   Mr. DeHart, that in various kinds of sexual -- if you want to

24   use the word deviants or predators -- build up in what they

25   do.  They start off at a low level and it accelerates out.

WILLIAM BURKE - CROSS-EXAMINATION

1    One thing that concerns me in this case is we went from

2    viewing pornography to swapping pornography to producing

3    pornography with bondage involved.

4    A.  Yes, sir.

5           THE COURT:  And encouraging another person to buy

6    that child for sexual abuse, and talk about violently abusing

7    the child, and even doing away with the child.  I listened to

8    your testimony, and I look at the tests, and none of it seems

9    to me to address the violence associated with this.  Would you

10   do that?  For example, an e-mail:  "I would love nothing more

11   than to actually engage in some of the activities I so

12   carefully fictionalize.  You must see I have a real love for

13   the violence that may be heaped on young females, girl

14   children and girl-like boys, extreme violence against

15   innocence, and also sexual destruction, physical,

16   psychological, has always been deeply attracted and

17   fascinating to me."

18        I don't see anything in your test to help with that.

19   A.  Well, what I did share was the history to -- I think where

20   violence -- interest in arousal to violence comes from.

21           THE COURT:  I understand how you got there, but what

22   I'm trying to understand is where he is.

23   A.  Right.

24           THE COURT:  And where he may go.

25   A.  Well, my --

WILLIAM BURKE – CROSS-EXAMINATION

1          THE COURT:  Can you comment on --

2     A.  Yes, sir.

3          THE COURT:  That doesn't seem to be a benign kind of

4     a thing that would achieve no arousal in some test.  It's an

5     altogether different world that we're talking about.

6     A.  Can you ask that last statement, please, again.

7          THE COURT:  What I'm saying is it's one thing to look

8     at pictures, it's one thing, as he has done, to insert

9     yourself in the pictures, and in the pictures, violently abuse

10    children.  It's another to encourage someone to go get a child

11    and do it, and then express your own view of what you would

12    like to do.  And there's another one that says let's go find a

13    child in Mexico or Thailand or wherever we can find him.

14    That, to me, takes us out of the realm of whether looking at

15    pictures arouse you.  So I'd like to know whether is he on the

16    spectrum of what we must be concerned about.  That's what I'm

17    getting at.

18    A.  Okay.  To the -- with that particular test, it's not just

19    pictures.  This test uses children's voices in -- some of them

20    pretty horrific, terrible to listen to.  This is on par, close

21    to what we're talking about with his writings.

22         So just to clarify, he was exposed to that, and he didn't

23    respond.  It wasn't just some pictures.  There's real

24    children's voices, which research has shown pedophiles

25    respond, particularly to violence.  He didn't respond.  Some

WILLIAM BURKE - CROSS-EXAMINATION

1    people don't, okay?  What I view my job is, what I'm primarily

2    tasked with is providing a risk assessment, okay?  How

3    dangerous is he.

4        Well, if he's under the supervision of a federal agent,

5    and under the supervision of a treatment provider who follows

6    the standards of care, for the last year and a half he's been

7    maintained safely in the community.  That's what I can say

8    about his level of risk.

9        If those things aren't in place, I think his level of risk

10   would go up considerably.  But what he's demonstrated over the

11   last year and a half is he can be maintained safely in the

12   community.

13       The assessment process is not perfect.  Some men don't

14   respond to anything, some men respond to everything.  It is

15   what it is.

16           THE COURT:  Okay.  Thank you.  Let me see if I have

17   any others.  I think you've answered all of my other

18   questions.  Any questions from what I've asked?

19           MR. DeHART:  I have one, Your Honor.  Do you want --

20           MR. McCANN:  Go ahead.

21   BY MR. DeHART:

22   Q.  Dr. Burke, one last question.  I mean, you would admit,

23   would you not, sir, that if you're wrong about your risk

24   assessment in this case, and Mr. Rivas was released, the

25   results could be disastrous?

WILLIAM BURKE - CROSS-EXAMINATION

1    A.  If I'm wrong about my risk assessment.

2    Q.  Yeah, hypothetically, if you're wrong?

3    A.  Oh, sure, if any -- Yeah.  If anybody is wrong.

4    Q.  Anybody you treat, right?

5    A.  Right.

6            MR. DeHART:  No further questions.

7            THE COURT:  Mr. McCann?

8            MR. McCANN:  Please the Court.

9                    REDIRECT EXAMINATION

10   BY MR. McCANN:

11   Q.  Doctor, when discussing Mr. Rivas' musical training, his

12   education, did he relate to you the types of music that he was

13   interested in and what he composed during the course of his

14   long career?  Was there music in addition to children's music,

15   was there other types of music?  Did he express an interest in

16   jazz, for instance?

17   A.  Right.  Jazz and classical music primarily.

18   Q.  And his degree from Julliard was in what discipline; do

19   you know?

20   A.  Composition.  But I --

21   Q.  Which included all forms of music?

22   A.  Right.

23   Q.  Thank you.  And you also testified that filling the void

24   and coping with where he is today, he's been using other

25   talents, such as painting, writing screen plays, and continues

WILLIAM BURKE – REDIRECT EXAMINATION

1  to compose music.  Correct?

2  A.  Correct.  Yes.

3  Q.  Of all types.

4  A.  Yes.

5          MR. McCANN:  That's all I have.

6          THE COURT:  Okay.

7          MR. McCANN:  Your Honor, may Dr. Burke be excused?

8          THE COURT:  Any reason the doctor shouldn't be

9  excused?

10          MR. DeHART:  No, Your Honor.

11          THE COURT:  Doctor, thank you very much.  We

12  appreciate your testimony.  You're excused, sir.

13      Any other witnesses, Mr. McCann?

14          MR. McCANN:  Your Honor, I have the gentleman who

15  wrote a letter to the Court, his name is Mr. Cisneros, he is

16  here, and I'd like for him --

17          THE COURT:  I'd be happy to hear from Mr. Cisneros.

18  Mr. Cisneros, you don't need to be on the witness stand.  If

19  you just stand at the podium and tell me what you'd like to

20  say, sir.

21          MR. CISNEROS:  Thank you, Your Honor.  I wanted to

22  share today that I've known Mr. Rivas since approximately

23  2006, in the capacity of musical composition, performance and

24  recording.  And that music centers primarily around jazz and

25  original composition.

1      During this time I would witness periods off and on where

2 Mr. Rivas seemed upset in general, not very happy, and other

3 times, you know, happy.  And I had no knowledge of what was

4 occurring, other than just witnessing somebody who seemed to

5 be unhappy.

6      When I learned of this serious situation that we're all

7 dealing with, it was very shocking, to say the least, and hurt

8 me deeply, because he was in -- he was just a very dear,

9 generous person to me.  And very generous with his time and

10 with his talent.

11     What I've witnessed during this process since the

12 information came to light about his transgressions, what I

13 witnessed is I have a sense that he is genuinely remorseful.

14 And that he's not remorseful for getting caught.  He is

15 remorseful for having squandered his time with these behaviors

16 over the course of his life.  He has expressed to me on

17 numerous occasions that he is grateful that this information

18 has come to the attention of the authorities, and that it has

19 been an awakening for him to address these serious issues that

20 he has.  So this has enabled him to seek and obtain help and

21 become self-aware, self-aware of behavior, self-aware of

22 thoughts, self-aware of moods.  And I have seen a massive

23 shift in this man.

24     I would try and engage in conversations prior to his

25 arrest to see what was bothering him, what's wrong with my

friend.  And I could only go so far.  But when I learned and

we continued speaking, I learned of a man who was brutalized

and suffered extreme trauma.  And I feel that he has had his

consciousness blown wide open with this, and that his complete

energy of being as he walks in this world is different.  And

that he will spend the rest of his life working to maintain

and correct and amend for his actions.

     And that is what I wanted to share with the Court today.

That is my experience with Mr. Rivas.  And he is a very sad

and very hurt person and a broken man in many ways.  And

willing to not only do the work, accept responsibility, but to

own that responsibility, to own the fact that he has done what

he's done.  He owns it.  From my experience in what I have

witnessed.  And is willing to do what it takes to make amends

for it.

          THE COURT:  Mr. Cisneros, first of all, thank you for

being here.  Secondly, that's very powerful and well thought

out, and I know he appreciates it.  It's obvious that you are

a dear friend and someone who thinks a lot of him.  I

appreciate you sharing that with me.  Thank you.

          MR. CISNEROS:  Thank you.

          MR. McCANN:  May I have a moment, Your Honor?

          THE COURT:  Sure.

          MR. McCANN:  Lauren Williams is here to address the

Court about the young child and her family that's -- that the

1    Court is aware of.  And it's a bit out of order, but if it's

2    all right with the Court, I'd like Miss Williams to be able to

3    come forward.

4            THE COURT:  Always glad to hear from Miss Williams.

5    Come forward, if you would.

6            MS. WILLIAMS:  Thank you, Your Honor.

7            THE COURT:  Yes, ma'am.

8            MS. WILLIAMS:  Good afternoon, Judge, may it please

9    the Court.  As Mr. McCann alluded to, I represent the mother

10   of the victim, the young child in this matter, who is the

11   stepdaughter of Mr. Rivas.  So while I represent the family,

12   this is really all one family.  Judge, she composed a letter

13   through me that I'll pass up, but I'll also summarize for you.

14           THE COURT:  Give me a second to read the letter,

15   please.

16           MS. WILLIAMS:  Yes, sir.  And for the record, Judge,

17   Mr. McCann as well as Mr. DeHart both have copies of this

18   letter.

19           THE COURT:  It's a short letter, but I'm letting it

20   sink in, so give me a moment.

21           MS. WILLIAMS:  Yes, sir.

22           THE COURT:  Go ahead.

23           MS. WILLIAMS:  Thank you, Judge.  As the letter

24   states, you can only imagine the family dynamics at play here

25   when this occurred and all the aftermath, as well as through

1   the treatment process.

2       I will say, last week, and Dr. Burke alluded to this

3   briefly, they did participate in a clarification with the

4   young victim in a therapeutic setting, obviously, and that was

5   extremely helpful for the child.  Her mother felt somewhat

6   uplifted after that.

7       As the letter states, Judge, she does not want to have any

8   input as to sentencing, she doesn't want that responsibility,

9   and that's a great weight to put on her and her children, to

10  give any input as to what is going to happen to their

11  grandfather.  So obviously she leaves that in your hands.

12      I will say, Judge, as of this morning, and we talked about

13  it yesterday, she did ask for me to ask that you consider a

14  self-report to the Bureau of Prisons.  They are in the middle

15  of the clarification process, the mother is apparently next,

16  and access to Mr. Rivas will help that therapeutic process.

17  So she did ask that I add that.

18          THE COURT:  Well, how about explain to me, I don't

19  want to know all about the process, but what do you mean by

20  the middle of it?

21          MS. WILLIAMS:  Judge, clarification typically, and

22  Dr. Burke actually could have explained this better than I

23  can, but typically it's toward the tail end of these treatment

24  modules where it is an apology and sort of an airing out with

25  the victim, and then those most affected by the actions.  It's

1    actually in a room in a therapeutic session.

2        So the daughter was last week, apparently went really

3    well.  My understanding is for the grandson, my client's

4    ten-year-old son is on the list, as well as my client.  So

5    they're actually in a therapy setting, kind of airing out

6    things.  They have letters to each other, that kind of thing.

7    So I know that that is on the list for therapy.  And she did

8    ask that I add that for you to consider.

9            THE COURT:  Thank you very much.  I appreciate it.

10       Mr. Rivas, anything you'd like to add?  Mr. McCann,

11   anything further?

12           MR. McCANN:  Your Honor, next would be Mr. Rivas to

13   address the Court.

14           THE COURT:  Mr. Rivas, if you'd come up here.

15           THE DEFENDANT:  Your Honor, I'd like to preface, I

16   have a statement that I prepared, after lots of thought, but

17   I'd like to address one issue with you.

18       The things that I wrote were horrible, unquestionably.  I

19   was not trying to encourage anyone to do anything.  These were

20   fantasy spin-offs from just writing.  I think the doctor

21   explained to you that I suffer from this strange thing called

22   narratophelipa, where you write and draw things, and that way

23   express these dark emotions.  That, I will cover that in my

24   statement, but I just wanted to make sure that I had prefaced

25   my remarks by telling you that.

1          THE COURT:  All right, sir, go ahead.

2          THE DEFENDANT:  I have spent many sleepless nights

3   thinking about what I could possibly say here today.  I have

4   no doubts that you have listened to countless defendants

5   declare remorse for their actions, and wondered whether they

6   were sorry not for what they did, but for the fact they had

7   been caught.

8       In my case, my arrest was a blessing, a chance to atone

9   for my mistakes and make a fresh start in my life, even if

10  this chance has come very late.  Even if the social and legal

11  consequences for my family and myself have been and will

12  continue to be devastating in many ways.

13      Though I have been deprived of my freedom and have lost

14  the trust and respect of society and most of my colleagues

15  through the exposure given to my case by local and

16  international media, I can truly say that my arresting

17  officers and my prosecutor have given me a once-in-a-lifetime

18  opportunity to stop my addictive behavior forever, to get real

19  therapeutic help for psychological issues that I have been

20  trying for years to remedy and stop on my own, without any

21  success.

22      I never had the slightest interest in acting on or

23  pursuing any of the ideas that motivated my writings, images

24  and e-mails.  My attraction to bizarre fantasy fiction of

25  sexual violence and horror which involved adults, and more

recently children, was an endless loop that played over and

over in my head, a senseless melody from which I tried

unsuccessfully to extricate myself several times.  I would

stop my behavior and erase pornographic content, but after a

time I would find myself returning to it for escape.

When I communicated with strangers online, I didn't know

and had no interest in knowing who they actually were.  I was

playing a role that embodied everything I feared and hated,

creating a boogie man into which I could project my dark

fantasies.  And I imagine those people I communicated with

were likewise fantasizing, since they never gave me to

understand otherwise.

My writings and my creation of drawings, pictures and

manipulated images were a twisted coping mechanism for my

anxiety and depression.  Violent events in the world and

difficult times in my life triggered a need to use these

fantasies.  I had been using this same useless strategy since

I was a child, and in recent years it became worse, but it

never became strong enough to overcome my moral judgment.  I

never shared with anyone the more grotesquely pornographic

aspects of my fictional image fantasies.  I had enough sense

to keep those to myself.  And instead of escape my behavior in

recent years, provide it -- instead of escape, my behavior

only provided more and more shame, more and more guilt.  It

became an empty and pointless behavior that led only to more

empty and pointless behavior.  I was running on a treadmill
that was leading nowhere.

I accept fully that I seriously betrayed the trust of my
family, my friends and my community with my deeds, as well as
by secretly harboring these dark thoughts, by spending so much
time pursuing twisted fictional fantasies on the internet,
when I should have been engaged in positive activities,
activities that contributed beneficially to the world instead
of adding to the rivers of poison that already overflow in
cyberspace.  And for that, I am eternally sorry.

But though I cannot go back and change that time I spent
senselessly on these behaviors, I can resolve to use every
moment of my life from this day on.  The very special love of
my wife, my family and my friends, as well as my success in
several areas of my profession as a musician, which also
arrived late in my career, helped balance my life and maintain
a perspective so that the wall between fantasy and reality
never crumbled.

Now, as far as the music that I wrote, which was mentioned
here, and me pursuing children's music, let me say I never
pursued children's music, it always pursued me.  I worked in
theater in New York in the 1980s, and I happened to be working
with a gentleman who was connected with Sesame Street.  He
loved my music, wanted me to work for Sesame Street.  That's
how I worked for Sesame Street.  Several years later, someone

who had been familiar with my work on Sesame Street contacted
me to do this Disney project.  I had no idea it was Disney
related.  I was sent a cartoon and told, write some music for
this, see what you can come up with.  And then later found out
it was a Disney project.

     With my work at Porter Gaud, I was again accosted by
someone who I worked with locally on a film project, and said
they need somebody at Porter Gaud; can you do this?  I did not
want to be involved in school work, I don't like school work,
I don't like teaching.  My thing is writing music.  But I was
interviewed for the job, I needed the money, it was a slow
time in my life.  I took it, and I did the best I could with
it.

     I have never had any interest in pursuing any line of work
to be near children.  And, in fact, the work that I did
pursue, put me nowhere near children.  I worked in a studio by
myself composing music on a computer.  I think I was in touch
with children in those 30 years maybe six times in a studio
setting with a producer.  So I wanted to make sure that that
was clear.

     I have invested my pretrial time seeking to change my
distorted thinking, to abandon my interest in all pornography,
legal or illegal.  And with the assistance of Dr. Burke and
his staff, as well as with Dr. McClain, I have begun to
reclaim myself from the grip and the compulsive pull of my

fantasies.

I still have much to accomplish in order to fully understand and reverse my behavior, lots of hard work ahead. My return to composing music has helped me in my struggles with my inner demons.  In the past year and a half I have been able to rebuild the interest and commitment I had lost to my creative work, and to continue on the path I believe I was meant to be on.

I also wish to provide significant help in whatever way possible to organizations that research the issues that plagued me and that may educate others in overcoming addiction to violent images and stories.

I had never been involved in any type of psychological counseling in my life until I was enrolled in Dr. Burke's group therapy sessions.  It was through these sessions that I saw other men with issues, some similar to mine, some worse, and the terrible impact their behavior had on their lives. Gradually I took a participatory role in these sessions and discovered that helping others also helped me to understand and cope with my own problems.  I realize how important accountability is for people who have been acting secretively, how important it is for them to express and expunge demons that torment them.

Just a few days ago I was able to provide advice to a gentleman recently arrested and facing consequences for his

1   actions.  His reactions to his plight reminded me of my own

2   two and a half years ago.  He was desperate, feeling he would

3   not be able to cope, probably feeling completely out of place

4   in a group of strangers who were asking him to divulge his

5   most shameful secrets.  I advised him to stick it out, to be

6   patient and to follow all the guidelines and therapy

7   assignments.  But most of all, to live one day at a time, to

8   let go of his previous life, of any consideration of the

9   future; only in that way would he be able to reach an

10  understanding of what put him there.  He said he just wanted

11  to get it over with and go to prison.  I said, going to prison

12  is not going to solve your problems.  I advised him he needed

13  to figure out how to get out of the mental trap he was caught

14  in, and to learn to look at life differently.  Otherwise, it's

15  all meaningless in the end, and you remain stuck in an endless

16  cycle.

17      These addictions are very real.  I have felt them myself.

18  And I have seen them up close.  They destroy men, women and

19  children in our community.  And though jokes abound in the

20  media about such Internet behavior, this is no laughing

21  matter.

22      I also wish to provide aid to organizations like Half the

23  Sky and the Malala Fund, organizations that improve the lives

24  of young women in Third World countries through education, to

25  help them escape sexual exploitation, prostitution and

indentured slavery.  Malala Yousafzai was a young lady shot by

the Taliban because she dared to go to school in Pakistan and

defy the crushing ideology of Islamic extremism.  Her story of

heroism and determination inspired me in my time of recovery

to reverse my life to end my obsession with darkness and

fictional violence, and move toward a productive life.

I have a friend who runs an organization that brings

musical education to poor students in Tanzania.  I have

already contributed to that organization, and hope to be of

more assistance in the future.

Also with the help of our computer forensics expert, Clay

Boswell -- I think you may remember him as a gentleman who

helped us last year with the suppression evidence hearing -- I

would like, with the permission of the Court and at my own

expense, remove as many postings of my fictional stories on

the Internet as possible, because I feel they are a negative

influence on readers who may be led on a path similar to mine.

My contribution to the world may be small.  I am a

musician, and musicians rarely have a very significant impact

on the world.  But however insignificant my role is, I wanted

to cease having negative consequences.  I am truly truly sorry

for the chaos I have caused thus far.  I wish to assert before

this Court that I have resolved to stop my negative behavior

forever.  I swear to be fully accountable from this time on,

and I am willing to accept the terms this Court may believe it

needs to impose in order to guarantee my accountability and my

commitment to a good and positive life.

But I also plead for the mercy and consideration of this

Court.  I don't have many years left, and I wish to use them

to help my family, to heal the bonds I have broken, and to

spend my last years with those who love me and have forgiven

me my illegal transgressions, as well as to make the world a

better place.

I want to continue to compose music, a task that will be

nearly impossible from behind prison walls.  I ask this Court

for a second chance, an opportunity to fully atone for my

mistakes, to continue the psychological therapy that has taken

me out of the darkness.  I want to fully overcome the negative

impact of my shameful behavior, and to earn accomplishments I

can be proud of, and not things I have to hide secretly and

run away from.

I ask this Court to allow me to transform my dysfunction

and my personal darkness into hope and light for myself, my

family whom I love deeply, and who need me in their lives, and

who have also spiritually inspired me to change, as well as

for others out there who may need my help.  I want my life to

move toward a bright note and not toward a dark cord of

despair.

THE COURT:  Thank you very much.  Mr. McCann,

anything further?

1          MR. McCANN:  Your Honor, I'm ready to argue on the

2     points that were in my memorandum.  I don't know if you want

3     to take the Government first or me first.

4          THE COURT:  Why don't we take a short break and give

5     the court reporter a chance to catch up.  It's about quarter

6     to 1:00; we'll start back at 1:00.

7       (A recess was held at this time.)

8          THE COURT:  Mr. McCann, did you want me to make this

9     exhibit a part of the record?

10         MR. McCANN:  Yes, Your Honor, thank you.  That's the

11    consent to assume online presence document?

12         THE COURT:  Yes.

13         MR. McCANN:  Without objection.

14         THE COURT:  That's part of the record.  Before I

15    approach sentence, anything further from the Government?

16         MR. DeHART:  No, Your Honor.

17         THE COURT:  Anything further from the defendant?

18         MR. McCANN:  As far as argument or just witnesses?

19         THE COURT:  Go ahead.  Give me your arguments.

20         MR. McCANN:  Judge, from the day Mr. Rivas walked

21    into my office and I learned about the charges in this case,

22    didn't know about the writings until the discovery came out

23    and until all the computers were analyzed, which took some

24    period of time, I wasn't fully aware of the severity of this

25    situation, and the behavior that these writings, pictures and

1   such portrayed of a human being.

2       Every one of us comes into the world in a healthy fashion,

3   I hope, both mind and body.  Somewhere along the way, however,

4   in early childhood, in all of us, guidance is given to us, our

5   lives are safe, we have -- could be faith based, could be

6   family based, whatever it is, but we're made to feel safe.

7   And I'm not a therapist, I'm not a doctor, but I think it's a

8   clear and universal statement that our lives are formed early

9   on, early on.

10      I first learned in the geography class the term

11  environmental determinism.  It had to do with if you lived in

12  a cold country, you farmed this or you didn't farm that, and

13  you ate fish and you had warm clothes, you had to raise

14  animals.  But this is a form of environmental determinism in

15  Mr. Rivas' life.  I don't know all of us coming from safe

16  existences can imagine what went on in battleground Cuba when

17  he was a youngster coming up.  There was no stability, there

18  was just chaos all the time.  Chaos combined with brutality,

19  which unfortunately may have come to be a normal way of things

20  for a youngster.  You didn't know any different.

21      My client tells me that when his mother threatened those

22  terrible things to him, he didn't know anything different.  It

23  was his mother.  Didn't arise until later in life when he got

24  to meet other adults that came from a stable background, this

25  was just horrible.  So his start was something I couldn't

1    imagine.

2        Then came my job of trying to find out how he can get a

3    handle on this, while admitting guilt and making sure this

4    talented man in a lot of respects can go on and be productive.

5    Met with his family, Dr. Burke, of course.  From the

6    beginning, Judge, as I've said earlier, and the record

7    reflects it, when Mr. Rivas was confronted, he gave a

8    confession.  Any defense lawyer looking at that says, oh, no.

9    You know, he was Mirandized, it's up and up.  Would say oh,

10   no.  But looking at where we are two and half years later,

11   he's been out on bond, under supervision, monitor and home

12   arrest, he's made those words meaningful to me and meaningful

13   to himself.  Because he's taken this bull, this problem, big

14   problem by the horns and has done the best he can with it.

15       Everybody in this room is saying, well, is he cured?  Is

16   he going to be cured?  He's not cured.  It's the man who stops

17   drinking for ten years and see a mini bottle of Jack Daniels,

18   and I'll just take a sip, and he's back on a bad path.  He's

19   not cured.  He's going to have to work at it for the rest of

20   his life.

21       Your Honor, in formulating your sentence in this case,

22   3553 factors are important, of course, and I know the Court

23   will consider every one of those.  But I'd like you to style a

24   sentence that fits not only the bad, what this man has done

25   and has admitted to from the first opportunity he had, to

1    giving him some hope that he'll come back from whatever

2    punishment he receives, able to get back into a normal life.

3        What care he'll receive when he's in the system in the BOP

4    is probably going to be limited; we all know that.  Dr. Burke

5    touched on that briefly.  Maybe he can go, and since he's

6    participating in group he can help other men like he's willing

7    to do.  Younger people.  Maybe he can use his talents, musical

8    talents in some fashion.  But the hope, to me, and in light of

9    the punishment he has to receive, is that he sees some light,

10   he sees some light that is not -- if he sees some light, maybe

11   he won't go back into that darkness that Dr. Burke talked

12   about, where he'll be tempted to go back into those old

13   behaviors to cope, to make himself feel better just to get

14   through the day.

15       Your Honor, in considering a variance from where we are,

16   and in light of our plea agreement which gives the Court

17   authority to go below the mandatory minimum of 15 years,

18   Mr. Rivas was 59 when this occurred.  He's 61 now.  Early on

19   as an exhibit to my memorandum, Mr. Rivas signed a proffer

20   agreement to cooperate.  Met with Agent Granger and me and

21   Rhett DeHart, sat down in the U.S. Attorney's office and

22   answered their questions.  Was asked if he would take a

23   polygraph, he said yes.  Then I told Mr. DeHart he'd already

24   taken one.  The Government didn't ask him to take one.

25       But the thought of the Government at that point was his

name had been in the paper and cover had been blown, so

nothing he could do at that point.  The document we admitted

here just a minute ago, he signed over his identity on

April 19, 2011, when they were in his kitchen and he was

giving a statement.  And that's the first step in using his

identity, so they can make exploration of other individuals

who were doing this type of thing.

And we renewed our request to help, and it was in the plea

agreement that the Government would give him a 5K if he did

cooperate.  I think under these cases, oftentimes people

charged with these crimes have nothing to offer.  You can't

hang around with other child pornographers because you're on

bond.  You can't say he's doing it or he's doing it, you can't

be on a computer.  Your options are limited as far as helping

the Government in a usual 5K setting.  But I think he did all

he could do, Judge, and is willing to do more if -- I think he

mentioned in a statement, take these writings and stories off

the Internet, if he can do that.

I'd ask the Court to give him some consideration by way of

variance of that effort to do what he could when his options

were limited.

Your Honor, the individual in New Jersey, the Court has

seen his presentence report, the state conviction and the six

years he got for that, and the 50 months of concurrent time he

received on the federal charge.  I don't know the reasons

1    behind that, but basically that man is a two-time offender.

2    Clearly an active individual trying to buy a child on the

3    streets of New Jersey.

4        One of the 3553 elements, number six, I believe, is to

5    beware of sentencing disparities for similar behavior.  The

6    behaviors here are different.  My client and the man in New

7    Jersey, both serious, both involved children, but I'd ask the

8    Court to fashion a sentence that is in keeping with that

9    element of 3553.

10        There is a move afoot, Judge, as recently as last week or

11    the week before, and it came from the Attorney General, to do

12    something about these mandatory minimum sentences, primarily

13    in drug cases, but also in other cases.  And if that at some

14    point comes about through guideline change, congressional

15    action, then it would help Mr. Rivas, then we'd like to be on

16    record as asking for that.

17        Judge, I ask you to exercise the discretion you have under

18    our agreement, vary downward from the mandatory minimum of 15

19    years, for this man who has done all he can in the past two

20    and a half years to make the situation right.  Didn't blame it

21    on anybody else, still hasn't blamed it on anybody else.  He's

22    here to take his punishment.  And I ask the Court, as I know

23    you will, to be fair under the factors.  He has a brief more

24    period of time before he can complete the first phase, and

25    there's need for him to go through the clarification with

1    his -- from his extended family.  He's been free of any

2    problems while he's been on bond.

3        We're going to request Butner, closer than what else is

4    available.  And ask that he be permitted to self-report, Your

5    Honor.  I know that's a concern to the Court, but that's our

6    request.  I think he's earned that chance to do that and to

7    take advantage of what the Bureau of Prisons allows for

8    someone who self-reports.

9        That's all I have, Your Honor.  Thank you for your

10   attention.

11           THE COURT:  Thank you very much.  Mr. DeHart?

12           MR. DeHART:  Judge Duffy, I'll be brief.  The

13   Government filed a sentencing memorandum that contains

14   numerous exhibits.  We'd ask that be made part of the record,

15   Judge.  We'll rely on that.  We --

16           THE COURT:  I'll allow that.

17           MR. DeHART:  We see no need to beat a dead horse,

18   Your Honor.  We're happy to answer any questions you have; the

19   agent, Agent Mark Granger is here.  He was transferred to

20   Washington D.C. after the indictment.  He drove down in case

21   Your Honor had any questions.

22       The only thing I would add, is basically addressed, we

23   believe, all of Mr. McCann's concerns in our sentencing

24   memorandum, with the exception of this mandatory minimum

25   issue.  And I would note for the record, Your Honor, that most

1    of the criticism on mandatory minimums historically had been

2    situations where the mandatory minimum far exceeded the

3    guidelines.  For example, maybe a crack cocaine case, small

4    level of drugs, perhaps the defendant's guidelines were two

5    years and the mandatory minimum was five.  Judge, I think we'd

6    all acknowledge in those cases the mandatory minimums are

7    controversial.  This case is just the opposite, Your Honor,

8    that the guidelines far far exceed the mandatory minimum.  So

9    I would just ask Your Honor to note that this is not one of

10   the cases that Mr. McCann, I think, was referring to

11   generally.

12       Having said that, Your Honor, we will defer to the Court.

13          THE COURT:  Thank you very much.

14       Mr. Rivas, how about stand at the podium where I can talk

15   to you.

16       First of all, I would say to you very earnestly, life has

17   not been fair to you.  And that's an understatement, given

18   your birth and upbringing.  However, you were given many many

19   gifts, and you've obviously done a lot of good with them.

20   You've used your talents in a tremendous way.  Those will go

21   with you wherever you go.  As you know, and as you said, you

22   expressed some relief that you were finally caught, so that

23   this could end.  And unfortunately sometimes that's the only

24   thing that brings about an end is when somebody is caught.

25       But this could be a new beginning for you, not a happy

1    beginning by any stretch, but an opportunity.  Mr. McCann

2    talks about hope.  I think as long as you have hope, as long

3    as you have the abilities that you have, there's a life you

4    can fashion that will keep you going in a positive vein

5    throughout your incarceration.  And I hope you do that.

6         This case is not like any other that I've had in almost 19

7    years on the bench.  It's definitely outside the heartland of

8    cases, as that's described in our case law.  I don't know of

9    an instance where to have a criminal history category, outside

10   of a murder case, where a person has a criminal history of

11   one, and the penalty is life imprisonment, but capped by a

12   statutory maximum, it's 50 years, which in this case would be

13   still life imprisonment.

14        So it presents the Court with a real dilemma as to how to

15   fashion a sentence that is fair not only to you, but the

16   community and others similarly situated.  There is no magic,

17   and there's no Solomon sitting on this bench.

18        I've considered the guidelines, I've considered the

19   statutory maximum and minimums, and I've considered the

20   statutory sentencing factors under 3553(a) in this case.  The

21   sentence must reflect the seriousness of the offense, and will

22   do that.  Promote respect for the law; it will do that.

23   Provide a just punishment; that, it will do.

24        One of the things that drives this sentence, other than

25   statutory maximums and another things, but from these factors

1    is adequate deterrence of others from doing the same thing.

2    Others like the man in New Jersey.  And to protect the public

3    from further crimes of you.  Hopefully, from what you've said

4    and what you've learned, that will not be a problem.

5         Concerning unwarranted disparities, to me, the sentence in

6    New Jersey is an unwarranted disparity.  It's a woefully

7    inadequate sentence for what we're discussing.  I'm not

8    criticizing the courts in New Jersey, I'm simply saying I

9    can't use that as a benchmark for anything.

10         Having considered the guidelines and the statutory

11   factors, it's the judgment of the Court the defendant,

12   Fernando Rivas, is hereby committed to custody of Bureau of

13   Prisons for a term of 180 months.  That term consists of 180

14   months as to count one, and 180 months as to count two, to run

15   concurrently.

16         Defendant does not have the ability to pay a fine;

17   therefore, a fine is waived.  Defendant must pay a $200

18   special assessment fee.

19         Upon his release from imprisonment, the defendant shall be

20   placed on supervised release for a term of life.  That term

21   consists of life as to each of counts one and two to run

22   concurrently.

23         Within 72 hours of his release from the Bureau of Prisons,

24   the defendant shall report in person to the probation officer

25   in the district to which he's released.  And he must comply

1    with the mandatory and standard conditions of supervision as

2    outlined in Title 18 Section 3583(d).  Also, the following

3    special conditions.

4        Defendant shall participate in a program of mental health

5    counseling and/or treatment as deemed necessary by the

6    probation officer, until he's released from the program by the

7    probation officer.  He shall contribute to the cost of the

8    mental health treatment, not to exceed an amount determined

9    reasonable by the Court-approved probation office's sliding

10   scale for services.  And will cooperate in securing applicable

11   third-party payment such as insurance or Medicaid.

12       Defendant shall participate in a computer Internet

13   monitoring program and abide by the rules of the program, as

14   approved by the probation officer.  He'll contribute to the

15   cost of that program not to exceed an amount determined

16   reasonable by the Court as using that same sliding scale, and

17   again, will cooperate in third-party payment.

18       Defendant shall participate in a program for testing or

19   treatment for substance abuse as approved by the probation

20   officer, until he's released from the program by the probation

21   officer.  He will contribute to the cost of that treatment not

22   to exceed an amount determined reasonable by the Court, again,

23   according to the sliding scale and any third-party payment

24   available.

25       Defendant shall not possess, procure, purchase or

1    otherwise obtain access to any form of computer network,

2    bulletin board, Internet or exchange format involving

3    computers, unless specifically approved by the probation

4    officer.

5        Defendant shall have no unsupervised contact with children

6    under the age of 18 without approval and consent of the U.S.

7    probation officer.

8        Defendant shall participate in the sex offender treatment

9    program as approved by the probation office, which may include

10   physiological and psychological testing.  Defendant shall

11   contribute to the cost of that treatment using the same scale

12   as approved by the probation office, and applying any

13   third-party payment as set forth earlier.  Defendant shall

14   comply with any laws regarding sex offender registrations of

15   the state in which he's released or resides.

16       Defendant shall not possess any audio or visual depictions

17   containing sexually explicit conduct as that term is defined

18   in Title 18 of the U.S. Code Section 2256(2)(A).  Defendant

19   shall not frequent adult book stores, sex shops, topless bars

20   or locations that act as sexual stimulants.

21       The defendant shall submit to random polygraphs for

22   treatment purposes, as well as compliance to the standard

23   conditions of supervision to be conducted by any person deemed

24   appropriate by the probation officer as a treatment tool to be

25   used in conjunction with the sex offender treatment program,

with the following limitations.  Answers to questions asked

during a polygraph cannot be used against the defendant in any

criminal proceedings other than an action to extend, modify or

revoke supervised release.  B, information obtained during

polygraph testing cannot be made public or released to the

state or any other prosecuting authorities.  And C,

information obtained during polygraph testing cannot be used

in a civil commitment proceeding under state or federal law.

The defendant shall make copayments up to the total cost

of the polygraphs.  The payment shall be made in addition to

copayments made for sex offender treatment, and shall be based

on sliding scale.

I'd ask the Bureau of Prisons to screen the defendant for

placement in Butner in North Carolina.

I have a very difficult time with the issue of self-

reporting, not as a punitive manner, but a concern.  Mr. Rivas

has experienced some dark times, some depression.  And faced

with a 15-year sentence, it's the Court's belief that it's

better for him to be taken into custody than self-report.  And

again, that's not punitive.

Does either the Government or defendant have any objection

to the form of the sentence?

MR. DeHART:  No, Your Honor.

MR. McCANN:  None.

THE COURT:  Mr. Rivas, you may appeal this sentence

1    if you haven't given up that right in your plea agreement.

2    And any notice of appeal must be filed within 14 days from the

3    day the judgment's entered, which will probably be today.

4        Mr. Rivas, it's a tough day for everyone, especially, I

5    know, for you.  But let me say this.  While that 15 years is

6    an awful long time, I can tell you, being 70 myself, that

7    you'll be released when you're 76.  You still have a life

8    ahead of you.  You're bright enough and capable enough while

9    you're there to prepare for that life, and I hope you do.  And

10   I hope you have a successful life when you're released.

11       Thank you very much.

12           MR. McCANN:  Your Honor, he has a CPAP that he has to

13   have with him for sleeping purposes; he's had it at the jail

14   before.  I'm going to make it available to the marshals so

15   they can take that to the County with him.

16           THE COURT:  I'd appreciate it if you would.  Thank

17   you.

18           MR. DeHART:  Judge Duffy, one housekeeping matter.

19   Your Honor, the Government would move to dismiss the remaining

20   count of the indictment per the plea agreement.

21           THE COURT:  I grant that motion.  Thank you.  Thank

22   you very much.

23

24       (Court adjourned at 1:30 p.m.)

25

1                    REPORTER'S CERTIFICATION

2

3          I, Debra L. Potocki, RMR, RDR, CRR, Official Court

4    Reporter for the United States District Court for the District

5    of South Carolina, hereby certify that the foregoing is a true

6    and correct transcript of the stenographically recorded above

7    proceedings.

8

9

10

     S/Debra L. Potocki
11   _____

12   Debra L. Potocki, RMR, RDR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25